UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

LANE WAGERS,                                    )
                                                )
                          Plaintiff,            )
                                                )        Case No. 1:05-CV-0121-SEB-VSS
v.                                              )
                                                )
ARVINMERITOR, INC.,                             )
                                                )
                          Defendant.            )

**ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANT
ARVINMERITOR'S MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on the Motion for Summary Judgment [Docket

No. 39] filed by Defendant ArvinMeritor, Inc. ("ArvinMeritor"), pursuant to Fed. R. Civ.

P. 56.  Plaintiff, Lane Wagers ("Wagers"), filed suit against his former employer of more

than thirty years following his termination in 2004.  ArvinMeritor argues that it is entitled

to judgment as a matter of law on all five counts of Wagers's complaint.  Counts One[1]

and Three[2] of the Complaint allege discrimination, in violation of the Americans with

Disabilities Act (the "ADA"); Count Two alleges retaliation, in violation of the ADA;

_____

[1]  "Defendant, through its acts and omissions, violated the Americans with Disabilities
Act with respect to Plaintiff's employment by <u>failing to engage in the interactive process</u> with
Plaintiff and by discriminating against him with respect to the terms and conditions of his
employment because of his disability and/or because of his perceived disability."  Compl. ¶ 32
(emphasis added).

[2]  "Defendant, through its acts and omissions, violated the Americans with Disabilities
Act with respect to Plaintiff's employment by <u>discriminating against him because of his
disability,</u> and/or because Defendant regarded Plaintiff as disabled."  Compl. ¶ 37 (emphasis
added).

Count Four alleges retaliation, in violation of the Indiana Worker's Compensation Act; and Count Five alleges state law claims of Constructive Fraud and/or Promissory Estoppel.

For the reasons discussed below, ArvinMeritor's motion for summary judgment is <u>DENIED</u> as to Counts One and Two but <u>GRANTED</u> as to Counts Three, Four, and Five.

## Factual Background

ArvinMeritor manufactures and supplies components to the motor vehicle industry. Currently ArvinMeritor employs approximately 31,000 workers in twenty-five countries. On October 15, 1973, Wagers was hired by ArvinMeritor. (Pl.'s Dep. at 40-41; Ferry Dep. at 47.) Wagers held various positions during his thirty-year period of employment with ArvinMeritor and worked at two separate facilities.

Wagers was initially hired as a production worker in ArvinMeritor's Franklin, Indiana, facility. His first position was running a spot welder on the muffler assembly line, a job he performed for eleven years, from the time he was hired in 1973 until 1984.[3] (Pl.'s Dep. at 41.) On August 11, 1974, while serving on the muffler assembly line, Wagers sustained "a severe punch press injury to his left hand and forearm." (Strickland Decl. ¶ 2.) This injury eventually necessitated the amputation of Wagers's left index

---

[3] During this period, in August of 1977, to be precise, ArvinMeritor reports that Wagers drove a "mule," or forklift, for approximately five days. (Pl.'s Dep. Exh. 5 at p. 108.) Wagers was removed from this position because he was unable to operate the machine fast enough and could not keep up with production. (<u>Id.</u>)

finger and caused extreme sensitivity in his hand.[4] (Id.)

Between 1984 and 1989, Wagers operated machines in the pipe department.  (Pl.'s Dep. at 41-42.)  From 1989 to 1992, Wagers worked as a convertor assembler.  (Id.)  In July of 1989, Wagers experienced a second injury when he pulled a nerve in his left wrist after he "struck the back of his left hand against a metal guard" while working on the production line.  (Id. at 49).  Wagers did not receive treatment for this injury until several months later, sometime in 1990.  (Pl.'s Dep. at 51, 53).  This injury, "over a period of time," resulted in nerve damage to Wagers's left hand.  (Strickland Decl., Exhibit B.)  By April of 1991, Dr. Strickland had concluded that there was "no other surgical opportunity for Mr. Wagers and that his condition must be viewed as permanent."  (Strickland Decl. Ex. C.)  Dr. Strickland opined that Mr. Wagers could work "largely right-handed" and ordered a permanent 20-pound restriction for Wagers's left arm.  However, this twenty-pound restriction was qualified by the fact that Mr. Wagers concedes he "does not use the left hand for any activity at work" because he is "able to do the job that has been given him effectively with his right hand. . . ."  (Strickland Decl, Ex. C.)  Dr. Strickland admitted that he was ordering the twenty-pound restriction for the left side "mainly because [Wagers] is able to work around it, and I am afraid that anything less than that might result in his termination from the job."  Id.

---

[4]  Dr. James Strickland, M.D., the hand surgeon who treated Wagers's injuries over three decades, stated, "When Mr. Wagers return[ed] to see me on June 21, 1990, he stated that for many years now he has had so much pain in the hand that he has been unable to use it in a meaningful way at his work activity."  (Att. 1, Strickland Decl., Ex. A, letter to Arvin re: Lane Wagers, July 8, 1990.)

Wagers reports that while he was employed by ArvinMeritor, Dr. Strickland continued to him to evaluate his condition, and to inform ArvinMeritor of his treatment, disabilities, work restrictions, and recommendations.  (Pl.'s Resp. at 4; citing Strickland Decl., ¶¶5-12.)  About a year after the 20-pound restriction was ordered, Dr. Strickland informed ArvinMeritor that Wagers's work-related injuries had spread to his upper right side,[5] and, in a July 7, 1992 letter, Dr. Strickland advised ArvinMeritor to eliminate production work from Wagers's schedule.  Dr. Strickland wrote:

> With regard to work activity, I feel rather strongly that Lane Wagers is not a candidate for strong or repetitious use of his upper extremities.  After hearing the details of his work activity, I would strongly favor eliminating production type of work for Mr. Wagers and helping him find some other less demanding area of involvement with your company.

(Strickland Decl., Ex. F.; Pl.'s Resp. at 5.)

In 1992, Wagers became a driver of a vehicle referred to as a "scrubber" and remained in that plant cleanup position until 2000.[6]  Wagers explains that this job required "very little" lifting and was something he was able to do "very well with [his]

---

[5] Specifically, Dr. Strickland advised ArvinMeritor that Wagers "has a cumulative trauma type of disorder of the involved [right] wrist, which involves mainly tendonities and capsulities of the wrist."  (Pl.'s Resp. at 4; citing Strickland Decl. Ex. D.)  Dr. Strickland suggested that Wagers "light work activities be varied so that he doesn't do the same type of work repetitiously throughout the course of the day."  (Pl.'s Resp. at 5; quoting Strickland Decl., Ex. D.)  It is clear that ArvinMeritor was aware of Dr. Strickland's evaluations because Dr. Strickland sent letters to ArvinMeritor informing the company of Wagers's condition in the normal course of his treatment of Wagers and these letters were produced by the company during the course of discovery.  (Pl.'s Resp. at 5; Strickland Decl. ¶¶ 4-6.)

[6] Early on in this time period, in April 1993, Wagers filed a worker's compensation claim for left shoulder pain.  (Def.'s Br. in Supp. at 3; citing Nunemaker Dep. Exh. Q.)

4

right hand."  (Pl.'s Resp. at 4; citing Wagers Dep., pp. 36-39.)

On July 7, 2000, Wagers returned to production work.  (Nunemaker Dep. Exhibit Y.)  From May 6, 2002 through May 17, 2002, Wagers performed as a floor inspector. (Pl.'s Dep. at 45, Pl.'s Dep. Exh. 12.)  However, Defendant represents that "[Wagers] was removed from the floor inspection position by his supervisor, Todd Smith, for failure to meet expectations of the position."  (Def.'s Br. in Supp. at 3.)[7]

In 2001 or 2002, Wagers bid on a forklift position at the Franklin facility and was awarded the position due to his seniority.[8]  (Def.'s Br. in Supp. at 3, citing Pl.'s Dep. at 44, 46; Nunemaker Dep. Exh. Y; Ferry Dep. at 70.)  ArvinMeritor's Business Unit Manager, Mr. Campbell ("Campbell") testified that Wagers's supervisors complained to him on several occasions that Wagers was slow and inefficient as a fork lift driver. (Def.'s Br. in Supp. at 4-5; citing Mark Campbell Affidavit ¶ 4.)  In response to these complaints, Campbell reduced Wagers's responsibilities on the production lines to which he was assigned and at times had to assign other employees to assist Wagers.  (Id. at 6.) Nonetheless, Wagers held the forklift position for approximately two-and-a-half years, during which period he never received a warning, counseling, or discipline of any kind

---

[7] Defendant's Brief cites "Pls. Dep. at 45, and Pls. Dep. Exh. 12" as the source of this statement.  We did not find any such reference at page 45 of the Plaintiff's deposition nor did we find Exhibit 12 of Plaintiff's Deposition, which purports to be a Memorandum authored by Todd Smith.  Indeed, our efforts to retrieve and review citations to the record caused us no small amount of frustration and inefficiency because the exhibits were not labeled on CM/ECF, thus necessitating that each document be opened and read before its contents could be determined.

[8] It is unclear from the record what specific production jobs Wagers held between July 7, 2000, and 2001 or 2002, when he moved to the forklift position.

from ArvinMeritor about any alleged inefficiency on his part.  (Pls. Dep. at 44; Pls.'
Resp. at 5-6.)

In September 2003, ArvinMeritor decided to close the Franklin facility.  On
December 17, 2003, a Plant Closing Agreement (the "Agreement"), which had been
negotiated with the Union, was finalized. (Def.'s Br. in Supp. at 4; citing Ferry Dep. at
31, 36, Ferry Dep., Exh. A.)  Pursuant to the Agreement, the procedures for transferring
employees provided that they would be permitted to apply for transfer to another
ArvinMeritor facility; in any event, whether or not they applied, their positions would end
effective September 26, 2004, or the date that all customer-related Plant manufacturing
operations ceased, whichever date occurred first.  (Id.)

Franklin employees who sought a transfer to ArvinMeritor's Gladstone
(Columbus) facility were directed to submit their applications to Jeff Schroer ("Schroer"),
an official with Profiles International, a third-party entity.  (Def.'s Br. in Supp. at 4; citing
Ferry Dep. at 38, Nunemaker Dep. at 29.)  Schroer would forward the applications he
received to the hiring team at the Gladstone facility.  (Def.'s Br. in Supp. at 5; citing
Ferry Dep. at 41.)  Schroer compiled on behalf of the Franklin facility the list of
employees who had applied for transfer to Gladstone, which was forwarded in the form of
a "hiring guide" to the Gladstone facility.  (Def.'s Br. in Supp. at 5; citing Ferry Dep. at
42, Nunemaker Dep. at 30.)  "The hiring guide contained the [employee's] name, social
security number, clock number, employment date, reason for leaving, rate of pay, job title
and classification, whether or not the employee had any absenteeism-related discipline,

whether or not the employee had any ratings completed in the last year, and whether the employee had any other disciplinary record." (Def.'s Br. in Supp. at 5; Ferry Dep. at 43, Ferry Dep. Exh. B.) The Gladstone team relied on the hiring guide in deciding whom to interview, focusing primarily on attendance and absence of discipline problems. (Nunemaker Dep. at 12, 31, 39; Ferry Dep. at 56.)

Kurt Nunemaker ("Nunemaker"), Human Resources Team Leader, interviewed each of the applicants on behalf of the Gladstone facility and made the ultimate decisions regarding the hiring of each applicant. (Nunemaker Dep. at 36.) After Nunemaker offered an applicant a position at the Gladstone facility, a new personnel file was created for the prospective employee. (Id.) At that point, Nunemaker contacted Human Resources employee, Melissa Ferry ("Ferry"), at the Franklin facility to notify her of the person(s) selected, and to request availability dates based on the positions each of the prospective employees was performing at the time at the Franklin facility. (Id. at 37; Ferry Dep. at p. 31, line 13.) After being notified of the availability dates by Ferry, Nunemaker contacted each of the employees by telephone to inform them that they needed to contact Ferry in order to sign a voluntary layoff sheet, as a way of officially ending their employment at the Franklin facility, because no one could work at both facilities at the same time. (Def.'s Br. in Supp. at 5; citing Ferry Dep. at 56-58, 64, Nunemaker Dep. at 37-38.)

On December 22, 2003, Wagers submitted such an application through Schroer for transfer to a forklift or welder position at the Gladstone facility. (Def.'s Br. in Supp.

at 6; citing Pl.'s Dep. at 62, Exh. 1.)  Under the heading, "Discipline Record," the Hiring

Guide reflects the word, "nothing."  (Pl.'s Resp. at 6, citing Ferry Dep., pp. 42-44 and Ex.

B.)  Wagers alleges that he told Ferry that the only circumstance under which he would

come to the Gladstone facility was to be a forklift driver and further he states that Ferry

had sent an email to Nunemaker about such a position.  (Pl.'s Dep. at 64-65, Ferry Dep. at

73-74.)  Wagers maintains that he was promised a forklift job and, in addition, that he

would not have to perform production work at Gladstone.  (Pl.'s Resp. at 7; citing Pl.'s

Dep., at 64-67, 104-105, and 96-97.)  In January 2004, Wagers inquired of Ferry whether

she had heard anything about his application, to which she replied that she had not, but

that she would send another email to Nunemaker.  (Pl.'s Dep. at 68.)  Ferry subsequently

informed Wagers they were working on finding him a job at Gladstone driving a forklift.

(Id. at 70.)  Wagers states that, after checking with Ferry four or five times, she informed

him that he would be assigned to a forklift job in the shipping department upon being

transferred to the Gladstone facility.  (Id. at 72-73.)

Consistent with the established procedures, Wagers voluntarily resigned from the

Franklin facility on March 8, 2004.  Once at the Gladstone facility,[9] Wagers was initially

assigned to the position of forklift driver in the shipping department.  Wagers had been

classified to drive a forklift at Franklin and had completed a training course similar to the

---

[9]  Wagers states that his personnel, medical, and worker's compensation files were
transferred to Gladstone within a week of March 8, 2004.  (Pl.'s Resp. at 7; citing Ferry Dep. at
49-55.)  Supervisors at ArvinMeritor reviewed these files after he was transferred and after he
complained about being forced to do production work despite his restrictions.  (Pl.'s Resp. at 7;
citing Pratt Dep. 31-33.)

one Gladstone required.[10]  (Nunemaker Dep. at 40.)  Wagers was supervised by Royce

McCullough ("McCullough"), a Customer Service Manager, in the course of which he

had the opportunity to observe Wagers's job performance loading and unloading trucks.

(McCullough's Dep. at 5, 15; Def.'s Exh. K.)  On one occasion, McCullough noticed that

Wagers was absent from his duties for what was, by McCullough's standards, an

excessive amount of time, compared to other forklift drivers.  (McCullough's Dep. at 15.)

McCullough complained to Nunemaker about Wagers's inefficiency, and Nunemaker

requested that McCullough give Wagers more time to acclimate to the plant before

drawing negative conclusions about his performance.  (Id. at 51, 71.)  At McCullough's

request, Jim Pratt, the second shift coordinator, also observed Wagers, resulting in his

making arrangements to remove Wagers from the forklift position and transfer him to the

Y-Pipe area.[11]  (Pratt's Dep. at 24-25.)  Wagers states that, despite ArvinMeritor's policy

and practice of informing employees of their work-related shortcomings and then

documenting those shortcomings, ArvinMeritor never advised him that there were

problems with his performance.  (Pl.'s Resp. at 9, citing Pratt Dep. pp 10-13, 41-42

(describing evaluation process).)  McCullough never criticized Wagers nor administered

any discipline of any kind to him while under his supervision.  (Pl.'s Resp. at 9-10; citing

McCullough Dep., pp. 16 & 22.)

---

[10]  At Gladstone, the forklift job was not a bid position; instead, management assigns employees to that position.  Id.

[11]  However, over the next three weeks, Wagers continued to fill in as-needed on the forklift. (Pl.'s Dep. at 83.)

9

On April 8, 2004, Wagers began work in the Y-Pipe area under the supervision of Delores Perez.[12]  (Nunemaker Dep. at 55, Perez Aff. ¶ 5.)  Wagers testified that he told Kurt Nunemaker of his restrictions and impairments immediately when he was instructed to report to the Y-pipe department.  (Pl.'s Resp. at 13; citing Pl.'s Dep. at 90.[13])  When Wagers informed Perez of his problems with his left arm, she directed him to work in various areas, ultimately moving him into the Truck Department to where there was a shortage of drivers.[14]  (Id. at ¶ 8, Nunemaker Dep. at 55, 75.)

While in the Truck Department, Wagers was supervised by Tim Sittering ("Sittering") and Nancy Starks ("Starks").  (Pratt Dep. at 27-28, Nunemaker Dep. at 108, Nunemaker Dep. Exh. P.)  Wagers was assigned to run a bender, which position entailed

---

[12]  Wagers asserts that the real reason he was transferred to the production department was because ArvinMeritor simply needed more people to handle all of the new equipment and production lines that were being transferred to the Gladstone plant from the Franklin plant, not because of any performance problems by him in driving the forklifts.  (Pl.'s Resp. at 11, citing Pratt Dep., p. 15-16.)

[13]  Wagers's testimony directly contradicts Nunemaker's testimony where he states that he was "not aware of any impairments or restrictions for any probationary employees that were terminated on April 23, 2004."  (Nunemaker Aff., ¶ 6.)

[14]  Perez sent an email to Nunemaker during the time ArvinMeritor was preparing to respond to Wagers's EEOC charge of discrimination.  In response to the question, "Did [Wagers] ask you to accommodate any restrictions?"  Perez wrote:

> Yes, he told me he hurt and [was] in pain as he had past injuries for [a] past job that made it hard for him to work on the line.  Therefore, continue to state that the only reason he came down to Gladstone was because he was promised a Forklift Driving position.  I told him I did not have any opening and that I could not just take my present drivers off to accommodate him.

(Pl.'s Resp. at 12; citing Nunemaker Dep., Ex. K.)

the bending of pipe.  (Nunemaker Dep. Exh. P, Nancy Starks Aff. ¶ 6, attached as Exh.

D.)  Regarding this assignment, Wagers allegedly told Starks that he had back problems,

was limited to lifting less than twenty pounds, and had been hired to drive a forklift,

which was the only job he wanted to do.  (Nunemaker Dep. at 92-93, Starks Aff. ¶¶ 6 and

7.)  Starks told Wagers that the pipe which he was assigned to bend only weighed eight

pounds, and to let her know if he ran into any problems.  (Starks Aff. ¶ 7.)  Starks then

met with Pratt to discuss her concerns over Wagers's inability or unwillingness to work.

(Pratt Dep. at 37-38, Starks Aff. ¶ 11.)  Following that conversation, Pratt arranged to

transfer Wagers back to the Y-Pipe area to be supervised by Perez.  (Starks Aff. ¶ 10,

Perez Aff. ¶9, Nunemaker Dep. at 94.)  After returning to the Y-Pipe area, Perez

complained to Pratt that Wagers was either unable to or unwilling to work.  (Pratt Dep. at

29, Perez Aff. at ¶ 7.)  On April 13, 2004, Perez sent an email to Nunemaker addressing,

among other things, Wagers's problematic performance, complaining that Wagers would

constantly remind her that he had a forklift classification even though she did not have

any openings for a forklift driver in her department.  (Pl.'s Dep. at 210, Perez Aff. ¶ 10;

Nunemaker Dep. at 94, Nunemaker Dep. Exh. L.)

    One of Pratt's responsibilities as the second shift coordinator was to decide where

employees were to work.  He could move "just any employee anywhere in the plant that

[he] needed to any job" as long as there was "any kinda logical reason" or a "need" to do

so.  (Pratt Dep., pp. 11-13.)  Pratt testified that, during Wagers's employment, the issue of

Wagers's work restrictions was brought to his attention by one of Wagers's supervisors

(either Perez, Sitterding, or Starks).  In response, according to Pratt, he personally reviewed Wagers's file in the Human Resources department, with the assistance of Eric Brewer ("Brewer"), a human resources clerk,  to determine if any restrictions were noted in his file, but apparently "did not see anything concerning restrictions" in Wagers's file. (Pratt Dep. pp. 31-33.)[15]

A third job-related injury to Wagers occurred on the night of April 15, 2004, when Wagers allegedly injured himself on the 4100 production line, which according to Wagers, he reported to his supervisor, Perez, on the day the injury occurred and tried to report the injury to Nunemaker the next day,[16] but, because Nunemaker was not in the office, he reported it to Brewer.  (Comp. ¶¶ 20, 21, 22; Pl.'s Dep. at 122, 124-25, 128.) Wagers alleges that subsequently, when he told his supervisor, Sitterding, that he had suffered an injury, Sitterding assigned him to a different job.  (Pl.'s Dep. at 127-28.) Wagers acknowledges that he did not fill out any injury report form or seek medical attention; in fact, he continued working normally until his termination.  (Pl.'s Dep. at 128.)

On April 23, 2004, approximately one week after Mr. Wagers reported his work-

---

[15]  Wagers contends that, because ArvinMeritor produced a stack of documents, which had been transferred to the Gladstone plant very shortly after Wagers went there to work, detailing Mr. Wagers's work restrictions and disabilities during discovery, it would have been impossible for Pratt to overlook Wagers's thirty-year medical history in ArvinMeritor's files. (Pl.'s Resp. at 13-14; citing Ferry Dep. at 54-55.)

[16]  Although Wagers could not reach Nunemaker immediately, he states that he did in fact inform Nunemaker that he was injured sometime during the ensuing couple of days.  (Pl.'s Dep. at 128.)

related injury to his supervisors, ArvinMeritor terminated Wagers's employment. (Compl. ¶ 24.)  Wagers was told by Nunemaker that the decision to terminate his employment was "based on performance."  (Compl. ¶ 25.)

Wagers first consulted a physician regarding his April 15, 2004, injury approximately two weeks after his termination, on May 6, 2004.  (Pl.'s Dep. at 168, 197.) Wagers returned to the Gladstone facility on May 11, 2004, to report the injury to Safety Coordinator Ric Deardorff ("Deardorff"), telling Deardorff that he had suffered an injury to his right shoulder, right elbow, right wrist and left arm.  (Pl.'s Dep. at 209, Nunemaker Dep. at 74, Ric Deardorff Aff. ¶¶ 5 and 7; Def. Br. in Supp. at 11.)  These injuries caused him to be unable to raise his arms.  (Pl.'s Dep. at 122.)  Deardorff advised Wagers to contact ArvinMeritor's worker's compensation administrator, Frank Gates ("Gates"), to report his injuries.  (Deardorff Aff. ¶ 10.)  Following his meeting with Wagers, Deardorff filed with Gates a report of injury relating to Wagers's alleged injury.  (Deardorff Aff. ¶ 11.)

Following Wagers April 23, 2004 termination, he filed a charge of discrimination with the Equal Employment Opportunity Commission and received his Right to Sue letter on or about November 1, 2004.  (Compl. ¶ 3.)  On January 25, 2005, Wagers filed a five count complaint in this court alleging discrimination and retaliation under the Americans with Disabilities Act, and additional common law claims under Indiana state law.

## Standard of Review

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. V. Catrett, 477 U.S. 317, 325 (1986).  After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. Id. at 322-23.  "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994); Celotex, 477 U.S. at 322-24.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge, 24 F.3d at 920.  Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant.  Venters v. City of Delphi, 123 F.3d 956, 962 (7th Cir. 1997).  If genuine doubts

14

remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enters., Inc. v. First Chicago Corp., 975 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

We note that the Seventh Circuit has determined that the standard is to be applied with special scrutiny to employment discrimination cases because intent and credibility are such critical issues.  See Senner v. North-central Technical College, 113 F.3d 750, 757 (7th Cir. 1997); Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).  To that end, we carefully review affidavits and depositions for circumstantial proof that, if believed, would show discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules and remain amenable to disposition by summary judgment so long as there is no *genuine* dispute as to the material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

## Legal Analysis

## I.    Claims of Disparate Treatment and Failure to Accommodate under the Americans with Disabilities Act

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training,

and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); see

also Burnett v. LFW Inc., No. 06-1013, at 18 (7th Cir. December 26, 2006) (slip opinion).

Wagers alleges a disparate treatment claim in Count Three (see footnote 2, *supra*) and a

failure-to-accommodate claim in Count One (see footnote 1, *supra*).  These claims are

analyzed differently, but both require plaintiff to establish that he was a "qualified

individual with a disability," which proposition entails his showing that he was "protected

by the ADA through evidence that he [was] disabled within the meaning of the ADA and

[was] qualified to perform the essential functions of the job with or without reasonable

accommodations."  Timmons v. General Motors Corp.,  No. 05-3258, 7, 2006 WL

3512462 (7th Cir. December 7, 2006) (citing 42 U.S.C. §§ 12102(2), 12111(8), 12112).

After addressing this threshold requirement, we shall evaluate both claims in turn.

### A.      Wagers was Disabled within the Meaning of the ADA

The ADA defines a disability as: "(A) a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; (B) a record

of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. §

12102(2).  Under the ADA's first definition of disability – "a physical or mental

impairment that substantially limits one or more of the major life activities of such

individual" – a  plaintiff must first show that the claimed impairment qualifies under the

federal regulations.  Next, the plaintiff much identify a recognized "major life activity"

that is "substantially limited" by the qualified "impairment."

For purposes of summary judgment, ArvinMeritor concedes that Wagers's alleged

16

injuries are qualifying physical impairments,[17] and that working is a major life activity.[18]
(Defs.' Br. in Supp. of Summ. J. at 17.)  Thus, the remaining issue is whether Wagers's
ability to work is "substantially limited" by his physical impairment.  The Seventh Circuit
provided guidance on this issue in Kupstas v. City of Greenwood, stating:

> In the context of working, the [EEOC] has interpreted
> "substantially limits" to mean "significantly restricted in the
> ability to perform either a class of jobs or a broad range of
> jobs in various classes as compared to the average person
> having comparable training, skills and abilities." 29 C.F.R. §
> 1630.2(j)(3)(I). It has further indicated that a plaintiff relying
> on the major life activity of working must present "evidence
> of general employment demographics and/or of recognized
> occupational classifications that indicate the approximate
> number of jobs (e.g., 'few,' 'many,' 'most') from which an
> individual would be excluded because of an impairment." 29
> C.F.R. Pt. 1630, App. § 1630.2(j).

398 F.3d 609, 612 (7th Cir. 2005); see also E.E.O.C. v. Rockwell Int'l. Corp., 243 F.3d
1012, 1017 (7th Cir. 2001).  This portion of Kupstas requires Wagers to provide evidence

---

[17]  "*Physical or metal impairment* means," among other things, "anatomical loss affecting
. . . the following body system[] . . . musculoskeletal."  29 C.F.R. § 1630.2(h)(1) (emphasis in
original). Wagers's loss of his left-index finger fits this definition of a physical impairment.  To
be sure, a finger is a part of the human-body structure, specifically the musuloskeletal system,
which Wagers has lost.  This is clearly a physical impairment under the regulations.  In addition,
the nerve-damage injury to Wagers' left-hand and arm adds additional evidence of a
"physiological . . . condition . . . affecting one or more of the following body systems . . .
musculoskeletal." Id.

[18]  Wagers's claim is that his disability substantially limits him in the major life activity
of "working."  Pl.'s Resp. at 18.  Federal regulations explicitly include the life activity of
"working" in the definition of "major life activities." 29 C.F.R. § 1630.2(I).  "To be sure,
working constitutes a major life activity under the ADA and the Rehab Act."  Peters v. City of
Mauston, 311 F.3d 835, 843 (7th Cir. 2002).  Wagers's reliance on the category of "working" as
a major life activity is beyond dispute.

of the demographics that relate to the job-type and job-market of which he is a member. However, the Seventh Circuit also recognizes "rare cases in which the claimants' impairments are so severe that their substantial foreclosure from the job market is obvious." E.E.O.C. v. Rockwell, 243 F.3d at 1017 (noting the example of DePaoli v. Abbott Lab., 140 F.3d 668, 673 (7th Cir. 1998) (medical evidence of plaintiff's inability to make any repetitive motions with her right hand sufficient to create triable issue on foreclosure from entire class of assembly line jobs)); see also Kupstas, 398 F.3d at 613 (noting that in the "rare cases" claimants need not present evidence of job demographics)).

Wagers, indeed, is such a "rare case," and his situation is analogous to the plaintiff in DePaoli. Wagers has presented evidence that due to the injuries he suffered, the loss of his left index finger and his ability to use his left hand and arm impose permanent limitations, thus creating a triable issue on Wagers's foreclosure from a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.[19] Dr. Strickland advised ArvinMeritor that Wagers was not a candidate for "production type" work:

> With regard to work activity, I feel rather strongly that Lane Wagers is not a candidate for strong or repetitious use of his upper extremities. . . . I would strongly favor eliminating production type of work for Mr. Wagers and helping him find some other less demanding area of involvement with your

---

[19] Dr. Strickland determined that Wagers had a "permanent disability" in April 1991, and that he would "always have to do a largely one-handed type of work activity." (Strickland Decl., ¶¶ 4-5 and Ex. C.)

company.

(Strickland Decl., ¶ 7 and Ex. F).  It is reasonably obvious that Wagers is "substantially limited" from a broad range of jobs in various classes, especially those which require timed completion of work or the use of two hands, as compared to the average person with comparable training, skills and abilities.[20]  Wagers's disability clearly and substantially limits him in the major life activity of working.  Kupstas, 398 F.3d 609.

Because Wagers has adduced evidence sufficient to create a genuine question of material fact as to whether he is disabled under the ADA's first definition, we next address whether Wagers is qualified to perform the essential functions of a forklift driver, with or without reasonable accommodations.[21]

### B. Wagers is Qualified to Perform the Essential Functions of a Forklift Driver with or without Reasonable Accommodations

In order for Wagers to create a genuine issue of material fact on this prong, he must establish that he is capable of performing the "fundamental job duties of the employment position the individual holds or desires," in this case, a position as operator of a forklift or scrubber.  (29 C.F.R. § 1630.2(n)(1); 42 U.S.C. § 12111(8).)  To satisfy

---

[20]  Wagers does not have a high school diploma or GED.

[21]  The ADA's second definition of disability requires "(B) a record of such impairment." Wagers could likely succeed under this definition as well.  Since ArvinMeritor admits his impairment, the documented history of the impairment in Wagers's employment file would suffice here.  At the very least, Wagers's employment records create a genuine issue of material fact as to whether Wagers is impaired.  See 29 C.F.R. sec. 1630.2(k).  Wagers's injury substantially limits the major function of working in the analysis above, and it does so here as well. The doctors' letters produced by Wagers create a genuine issue of material fact as to whether ArvinMeritor had a record of Wagers's impairment.

this definition, a plaintiff must demonstrate "the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions[22] of such position."   29 C.F.R. § 1630.2(m).

ArvinMeritor argues that Wagers testified at his deposition that he was unable to perform the essential functions of production jobs, or even work at all following his alleged April 15, 2004 injury.  (Pl.'s Dep. at 142, 173).  If Wagers could not work at all following his April 15, 2004 injury, he was not qualified for his position.  See Martini v. A. Finkl & Sons Co., 2000 U.S. Dist. LEXIS 3234 (N.D. Ill. March 7, 2000) (individual who claims he is unable to work is not a "qualified individual" for purposes of the ADA).

Wagers provides evidence that he is capable of performing the essential functions of a forklift or scrubber driver and in fact has done so since becoming statutorily disabled. For example, Wagers drove a scrubber for ten years at the Franklin facility.  Also, Wagers was given full marks on at least one "Forklift Operator Evaluation" and has the experience, skills, and licenses to operate forklifts at ArvinMeritor.  (Forklift Evaluation of July 16, 2002, Pl.'s Att. 7, Bates No. ARVIN0571.)  At the very least, this evidence creates a genuine issue of material fact as to Wagers's ability to perform the essential functions of a driver in the general production area of ArvinMeritor.  Having determined

---

[22]  29 C.F.R. § 1630.2(n)(1) defines "essential functions" as:
      In general. The term essential functions means the fundamental job
      duties of the employment position the individual with a disability
      holds or desires. The term "essential functions" does not include
      the marginal functions of the position.

that Wagers is a "qualified individual with a disability" under the ADA, we now turn to his individual claims under this Act.

### C.    Disparate Treatment Claim Under the ADA

When a plaintiff, such as Wagers, seeks to prevail on a discrimination claim without direct evidence of discriminatory motive or intent, courts apply the <u>McDonnell Douglas</u> burden shifting approach, also known as the indirect method.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  The Seventh Circuit recently provided a clear guide to applying the indirect method:

> The indirect method requires a showing that: (1) the plaintiff was a qualified individual with a disability (which he will have already established if he gets this far); (2) he was meeting his employer's expectations (this is meant in a different sense than the threshold inquiry of whether he is qualified for the job with or without accommodations, which is a question of ADA coverage); (3) he was subjected to an adverse employment action; and (4) the circumstances suggest that the plaintiff's disability was the reason the employer took adverse action against him. The showing required under the fourth prong of the indirect method may (not must) be made by demonstrating similarly situated nondisabled employees were treated more favorably. If the plaintiff shows all four of these elements, the employer has the burden of showing a legitimate, nondiscriminatory reason for taking adverse action against the plaintiff. If the employer meets its burden, the employee must show the employer's stated reason is pretextual.

<u>Timmons v. General Motors Corp.</u>, 2006 WL 3512462, at *6 (7th Cir. March 29, 2006); <u>see also</u> <u>Kupstas v. City of Greenwood</u>, 398 F.3d 609 (7th Cir. 2005) (effectively combining the third and fourth prongs).

As discussed above, the evidence establishes that Wagers is disabled within the meaning of the ADA; and thus, we turn to the next issue: was Wagers meeting his employer's legitimate employment expectations?  In Robin v. Espo Engineering Corp., the Seventh Circuit held:

> At the outset, this Court's inquiry into the issue of legitimate expectations is more aptly characterized as simply bona fide expectations, for it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers.  In other words, so long as the employer's employment expectations are in good faith without fraud or deceit, we only determine if the employee met them. Should [plaintiff] fail to establish that he was meeting [his employer's] bona fide expectations, he is not entitled to present his case to the jury and we need not proceed to the remaining steps of the McDonnell Douglas framework.

200 F.3d 1081, 1090 (7th Cir. 2000) (internal citations omitted).

Wagers asserts that, if he had not been performing up to ArvinMeritor's expectations, he would not have been considered for transfer to the Gladstone facility. (Pl.'s Resp. at 23; citing Nunemaker Dep. at 30-31.)  Wagers also notes that he had successfully performed the jobs of driving a forklift and scrubber for years previously without incident at the Franklin facility.  (Id.)

In reply, ArvinMeritor argues that Wagers cannot establish that he was meeting ArvinMeritor's legitimate performance expectations because practically every supervisor Wagers worked for at the Gladstone facility raised complaints regarding his performance. (McCullough Dep. at 15, 17-18; Pratt Dep. at 21-22, 24-25, 27-29, 37-38; Nunemaker

Dep. at 51, 55, 70-72, Nunemaker Dep. Exhs. K, L.)

Wagers's evidence that he was meeting his employer's legitimate expectations is related to his work at the Franklin facility, not at Gladstone, and it is only Wagers's performance at the time he was terminated that is relevant here.  His prior performance at another plant does not factor into our analysis.  Timmons v. General Motors Corp., 469 F.3d 1122, 1128 (7th Cir. 2006) ("Even if we accept, as Timmons urges, that his past performance reviews establish his prior satisfactory performance, he has not disputed that at the time he was placed on leave, he was failing to meet GM's legitimate expectations in the foregoing respects.")  It is clear that Wagers's performance at the Gladstone plant was viewed by his supervisors as unsatisfactory.  As explained above, when the undisputed facts are viewed in the light most favorable to Wagers, he is a qualified individual with a disability who was not meeting his employer's legitimate employment expectations when he suffered an adverse employment action.  Wagers therefore fails to establish a prima facie case of discrimination, and ArvinMeritor's motion for summary judgment on Wagers's disparate treatment claim in Count Three must be GRANTED.

### D.    Failure-to-Accommodate Claim Under the ADA

The ADA also prohibits an employer from "not making reasonable accommodations[23]  to the known physical or mental limitations of an otherwise qualified

---

[23]  Reasonable accommodations may include:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(continued...)

individual with a disability. . . ."  42 U.S.C. § 12112(b)(5)(A).  To establish a prima facie case of failure to accommodate, a plaintiff must show that: (1) he was disabled, (2) the defendant employer was aware of his disability, (3) he was qualified for his job, and (4) his disability caused the adverse employment action.  Saladino v. Envirovac, Inc., 167 Fed.Appx. 559, 561 (7th Cir. 2006) (citing Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1032 (7th Cir.1999)).

After an employee's initial disclosure, "the ADA obligates the employer to engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances."  Gile v. United Airlines, Inc., 213 F.3d 365, 373 (7th Cir. 2000) (internal quotations omitted).  "It is well established that under the ADA, the employer's duty to  reasonably accommodate a disabled employee includes reassignment of the employee to a vacant position for which she is qualified." Dalton v. Subaru-Iszuz, 141 F.3d 667, 677 (7th Cir. 1998) (citing 42 U.S.C. § 12111(9)(B)).

Wagers argues that he "requested a specific accommodation for his disabilities: he made it perfectly clear to everyone that he wanted to be placed back on the job he has

---

[23](...continued)
(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

been promised – the forklift job." (Pl.'s Resp. at 26.) However, ArvinMeritor failed to discuss with Wagers his requested accommodation at Gladstone or to explore whatever possibilities might have existed. (Id.)

In reply, ArvinMeritor states that when Wagers's supervisors attempted to place Wagers in positions that comported with the general twenty-pound lifting restriction he had reported to them, Wagers protested that he was only at Gladstone to perform forklift work. ArvinMeritor contends that it is "the employer's prerogative to choose a reasonable accommodation; and an employer is not required to provide the particular accommodation that an employee requests." (Def.'s Reply at 12 (quoting Jay v. Intermet Wagner, Inc., 233 F.3d 1014, 1017 (7th Cir. 2000)). ArvinMeritor argues that it was Wagers who unreasonably protested ArvinMeritor's efforts because he wanted to perform only one type of work. (Def.'s Reply at 12.)

We believe that Wagers has established a prima facie case of failure to accommodate, as outlined in Saladino. First, as explained above, Wagers has demonstrated that he was disabled under the ADA, and, second, that ArvinMeritor was aware of Wagers's disability. ArvinMeritor maintains that there is no evidence that the Gladstone plant supervisors were aware of Wagers's disability when he was hired or removed from the forklift position, and that following his removal and his complaint that he was restricted to lifting less than twenty pounds, Gladstone management personnel were unable to locate any documentation in Wagers's file to substantiate his alleged restrictions. Def.'s Reply at 4-5 (citing Nunemaker Aff. ¶ 6; Pratt Dep. at 31; Ferry Dep.

at 80-81).  In <u>Hedberg v. Indiana Bell Telephone Co., Inc.</u>, the Seventh Circuit explained:

> We think that an employer cannot be liable under the ADA
> for firing an employee when it indisputably had no knowledge
> of the disability. . . . At the most basic level, it is intuitively
> clear when viewing the ADA's language in a straightforward
> manner that an employer cannot fire an employee "because
> of" a disability unless it knows of the disability. If it does not
> know of the disability, the employer is firing the employee
> "because of" some other reason.

47 F.3d 928, 932 (7th Cir. 1995).

We find ArvinMeritor's argument unpersuasive because, when the facts are considered in the light most favorable to plaintiff, it is clear that within Wagers's employment records which were transferred to Gladstone was evidence of his disability, including the letters from Dr. Strickland.[24]  Further, Wagers did not have a reason to tell his supervisors of his disability at the Gladstone facility at the time he was operating the forklift because, from his perspective, his disability was accommodated.  Following his removal from the forklift position, Wagers stated albeit inarticulately to his supervisors that he was disabled and had restrictions.  Although these statements were not as clear and precise in laying out the situation as they could have been, they sufficed for purposes of prompting a follow-up investigation by Pratt and Brewer.  Further, this is not a case in which the employee's disability is fully hidden; Wagers is missing an index finger.  This

---

[24]  The fact that Pratt and Brewer were unable to find any notice of these restrictions in Wagers's file is largely irrelevant, because, as ArvinMeritor states in its Reply, the company's medical files are kept separately from personnel files and therefore the Gladstone managers would not have seen the restrictions when they checked Wagers's personnel files.  It is not Wagers's fault, however, that ArvinMeritor was unable to extract the information from its own files.

physical indicator, in combination with his somewhat clumsy complaints of restrictions were enough to alert ArvinMeritor to the fact of his disability.

The third prong of the prima facie case requires Wagers to demonstrate that he was qualified for his job.  This prong is not seriously in dispute.  Wagers had the experience, training and skills to operate a forklift or drive a scrubber.

Under the fourth prong, Wagers is required to establish that his disability caused the adverse employment action.  The parties agree that Wagers was subjected to an adverse employment action.[25]  However, ArvinMeritor contends that Wagers's probationary employment was terminated because of his poor performance and failure to meet the company's expectations.  (Def.'s Reply at 10-11.)  Wagers argues, "If the jury believes Arvin[Meritor]'s witnesses, the supervisors and managers at the Gladstone plant were unaware that Wagers had any restrictions at all (let alone seriously disabling ones), and it logically follows that they did not find out about his restrictions (and disabilities) until he was transferred into production and began protesting and requesting an accommodation."  (Pl.'s Resp. at 29, citing Pratt Dep., pp. [sic]; Perez Aff., ¶¶ 5-6; Nunemaker Dep., Ex. K.)  Shortly after finding out that Wagers had restrictions, that he was requesting an accommodation, and could not do (or was not "suitable for") production work, Wagers was fired without warning.[26]  Id.  Wagers argues that a jury

_____

[25]  "ArvinMeritor does not dispute that Wagers' termination was an adverse employment action." (Def. Brief in Support, 14.)

[26]  Wagers claims that he was forced to do production jobs which ArvinMeritor knew
                                                                                    (continued...)

27

could reasonably, and easily, infer a discriminatory motive from these facts."  Pl.'s Resp. at 29.

Wagers has mustered facts from which a reasonable jury could find that ArvinMeritor terminated his probationary employment because of his disability.  The temporal proximity of Wagers's reports to his supervisors of his disability and his termination, the lack of any real investigation by management into what if any disability and restrictions Wagers needed to have accommodated, and the fact that Wagers was transferred to positions from which, arguably, his supervisors should have known he was restricted creates a question of material fact as to whether Wagers was terminated because of his disability.  Thus, we hold that Wagers has established a prima facie case of failure to accommodate.

Further, following Wagers's initial disclosure of his disability to his supervisors, "the ADA obligate[d] the employer to engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances."  Gile, 213 F.3d at 373 (internal quotations omitted).  There is no evidence of any "interactive process" having been undertaken to determine the appropriate accommodation for

---

[26](...continued)
(and had known since the early 1990s) that Wagers could not do, and which would put Wagers at risk for additional injury or disabilities.  It is this inability to perform production work that led to Wagers's discharge.  Pl.'s Resp. at 28, citing Nunemaker Dep., p. 72 (stating that Wagers's "performance in production" led to his discharge); Pratt Dep., pp. 34-40 (stating that Pratt and other supervisors met and concluded that Wagers was "not suitable for production work" and determined to tell Human Resources that he was "going to be released.")

Wagers; instead, he was passed from one supervisor to the next and assigned a series of different jobs, but no real attempt was ever made to sit down with Wagers to come up with a plan to accommodate his restrictions (restrictions which, as we have noted previously, were or should have been readily available to his supervisors).  For this reason, Defendant's motion for summary judgment on Wagers's failure-to-accommodate claim in Count One must be DENIED.

## II.    Wagers's Retaliation Claims

Wagers advances two retaliation claims in this case: Count Two alleges that ArvinMeritor retaliated against him because he sought an accommodation for his disabilities, in violation of the ADA, 42 U.S.C. § 2000e-3(a), and Count Four alleges that ArvinMeritor committed a retaliatory discharge in order to prevent Wagers from filing a future worker's compensation claim, in violation of public policy, i.e., a *Frampton* claim.

### A.    Retaliation in Violation of the ADA

Both parties have recited the elements of a prima face case of retaliation as set forth in Talanda v. KFC Nat. Management Co., 140 F.3d 1090, 1095 -1096 (7th Cir. 1998).[27]  The test laid out in Talanda bears similarities to a more recent holding by the

---

[27]  In Talanda, the Seventh Circuit wrote:
   An employee demonstrating a prima facie case of retaliation under the ADA, as under Title VII, "must establish that (1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action." Roth v. Lutheran Gen. Hosp., 57 F.3d 1446, 1459 (7th Cir. 1995).

Seventh Circuit in Stone v. City of Indianapolis Public Utilities Div., but because the

Seventh Circuit specifically stated in that Stone that it was creating "a new rule for the

adjudication of retaliation cases," we must and do rely on this authority.  281 F.3d 640,

644 (7th Cir. 2002).

In Stone, the Seventh Circuit created two new "distinct routes to

obtaining/preventing summary judgment," the first of which is relevant to the case at bar.

This path is unrelated to McDonnell Douglas, requiring the plaintiff to present evidence

(either direct or circumstantial) that he engaged in protected activity and "as a result

suffered the adverse employment action of which he complains."  Stone, 281 F.3d at 644;

Sylvester v. SOS Children's Villages Illinois, Inc., 453 F.3d 900, 902 (7th Cir. 2006)

(modifying Stone to allow consideration of both circumstantial and direct evidence in the

first "route").  "If the evidence is . . . contradicted, the case must be tried unless the

defendant presents unrebutted evidence that he would have taken the adverse employment

action against the plaintiff even if he had had no retaliatory motive; in that event the

defendant is entitled to summary judgment because he has shown that the plaintiff wasn't

harmed by retaliation."  Stone, 281 F.3d at 644.

Wagers asserts that he complained immediately when he was given work that he

could not perform and that he requested an accommodation.  (Pl.'s Resp. at 30; citing

Nunemaker Dep., Ex. K).  Wagers further asserts that his request for an accommodation

was protected activity.  (Pl.'s Resp. at 30; citing Cormier v. City of Meriden, 420 F. Supp.

2d 11, 21 (D. Conn. March 6, 2006).)  Finally, Wagers alleges that the adverse

30

employment action against him was his termination, and that ArvinMeritor terminated his employment in order to interfere with his rights under the ADA to seek an accommodation for his disability.  (Compl. ¶ 27E.)

Thus, Wagers must demonstrate that his protected activity, that is, his request for an accommodation, resulted in the adverse employment action, his termination.  In support of such a showing, Wagers states "the temporal proximity between (his) protected conduct and his termination is virtually instantaneous when considered in the light of his 30 year career with Arvin[Meritor]."  (Pl.'s Resp. at 31.)  In addition, Wagers maintains that, upon hearing about his restrictions and allegedly reading about his disabilities in his employment file, ArvinMeritor chose not to engage in the interactive process in an effort to find a reasonable accommodation for Wagers, but rather placed him in production jobs it well knew he could not tolerate and then used his inability to perform in these jobs as a pretext for his discharge.  Id.

ArvinMeritor contends that it is entitled to summary judgment on Wagers's ADA retaliation claim because the temporal proximity between the time he allegedly requested an accommodation and the time he was terminated is insufficient to establish causation. Further, ArvinMeritor claims that there is no evidence that Gladstone management personnel ever even saw the information regarding his restrictions in his file.  Finally, ArvinMeritor argues that Wagers cannot demonstrate that his termination was pretext for retaliation.  Def.'s Reply at 15.

We conclude, after careful review, that Wagers has provided sufficient

circumstantial evidence to permit a jury to conclude that Wagers's protected activity, (requesting an accommodation), prompted his termination.  That said, we agree with ArvinMeritor that "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."  Stone, 281 F.3d at 644 (citing cases).  However, it is not just the timing here that is suspicious, but the fact that after Wagers arguably gave numerous supervisors sufficient notice of his disability and restrictions (we acknowledge that this is a disputed question for the jury to resolve), ArvinMeritor did not engage in an interactive process to find and to institute a reasonable accommodation for Wagers (again, this is another disputed question for the jury to resolve), choosing instead to place him in production jobs he would not be able to perform.  Wagers's inability to perform these production jobs prevented him from meeting ArvinMeritor's expectations, which became the reason for his termination.  A reasonable jury could conclude that Wagers's termination was pretext for retaliation, if it also found that ArvinMeritor knew of Wagers's disability and chose to place him in jobs in which he would fail in order to create a reason for his termination.  Id.  When the facts are considered in the light most favorable to Wagers, it becomes clear that he has succeeded in providing sufficient evidence, although contradicted, to support his claim of retaliation under the ADA.  For these reasons, ArvinMeritor's request for summary judgment on Count Two of the Complaint must be DENIED.

### III.   *Frampton* Claim

Wagers has alleged in Count Four of his Complaint that ArvinMeritor retaliated against him "because he attempted to exercise his rights under the Indiana Worker's Compensation Act and to keep him from further exercising such rights."  Compl. ¶ 39.

> Under Indiana law, "[g]enerally, employers may terminate employees for no cause whatsoever or for any cause at all without incurring liability." Hamann v. Gates Chevrolet, Inc., 910 F.2d 1417, 1418 (7th Cir.1990). One exception to this general rule is that an employee who has been discharged in retaliation for filing a claim for workers' compensation may recover damages for wrongful termination. Frampton v. Central Ind. Gas Co., 260 Ind. 249, 297 N.E.2d 425, 428 (1973). To survive summary judgment on a Frampton claim, the plaintiff must present evidence that would support a finding that the discharge was caused by his filing for benefits. Goetzke v. Ferro Corp., 280 F.3d 766, 774 (7th Cir. 2002).

Mack v. Great Dane Trailers, 308 F.3d 776, 784 (7th Cir. 2002).  Indiana courts have ruled that the public policy exception is "limited and strictly construed."  Bricker v. Federal-Mogul Corp., 29 F. Supp. 2d 508, 511 (S.D. Ind. 1998) (J. Barker) (citing Bienz v. Bloom, 674 N.E.2d 998, 1002 (Ind. Ct. App. 1996)).  In 1991, the Indiana Court of Appeals held that Frampton applies not only in cases where the employee is discharged after filing a workmen's compensation claim, but also "in cases where the employee is fired for merely stating her intent to file a claim."  Stivers v. Stevens, 581 N.E.2d 1253, 1254 (Ind. Ct. App. 1991).

ArvinMeritor contends that summary judgment is appropriate here because "Wagers never filed, expressed an intention to file, nor even suggested that he may file a

worker's compensation claim before he was terminated." (Def.'s Br. in Supp. at 27, citing Pl.'s Dep. at 12, 119, 169.) In response, Wagers claims that a reasonable jury could conclude from the evidence that Pratt learned of Wagers's history of seeking compensation for on-the-job injuries when Pratt examined Wagers's employment file and that the proximity in time between the day Pratt reviewed his file and the day Wagers was fired indicates that ArvinMeritor had decided it would fire Wagers before he filed yet another worker's compensation claim. Further, the fact that Wagers reported a new injury that he allegedly had sustained on the production floor on April 15, 2004, when viewed in light of his termination one week later on April 23, 2004, would permit a reasonable jury to conclude that ArvinMeritor had sought to prevent Wagers from filing a worker's compensation claim. (Pl.'s Resp. at 33.)

The uncontroverted evidence establishes that Wagers did not file his worker's compensation claim until after his termination, at the time when he saw his doctor. Similarly, there is no evidence that Wagers expressed to anyone at ArvinMeritor prior to his termination that he intended to file a worker's compensation claim based on the injury he sustained on April 15, 2004. We are not aware of any court opinions which have recognized a claim for retaliation under Indiana law based on the employer's assumption that an employee reasonably might file a worker's compensation claim. In any event, there is no evidence to indicate that Wagers's worker's compensation claims were illegitimate, or that ArvinMeritor would have assumed that Wagers would have been more likely than other employees to file worker's compensation claims. Wagers's

Frampton claim is simply to speculative and therefore ArvinMeritor's motion for summary judgment on Count Four of Plaintiff's Complaint is GRANTED.

## IV.   Promissory Estoppel

In Count Five of Wagers's Complaint, he alleges contructive fraud and/or promissory estoppel.  Wagers alleges that he "relied to his detriment on a definite promise made by Arvin[Meritor] that if he resigned his employment at Arvin[Meritor]'s Franklin plant he would be given a forklift position at the Columbus facility which accommodated his restrictions.  Arvin[Meritor] knew that Mr. Wagers would rely on this promise and intended for him to do so.  As a result of his reasonable reliance on Arvin[Meritor]'s promise, Mr. Wager's suffered the loss of income and benefits he would have received had he remained at the Franklin plant."  Compl. at ¶ 41.

A claim of promissory estoppel requires that Wagers show: (1) a promise by ArvinMeritor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise.  Citizens Fin. Servs. v. Innsbrook Country Club, Inc., 833 N.E.2d 1045, 1056 (Ind. Ct. App. 2005).

ArvinMeritor argues that Wagers's promissory estoppel claim fails because Wagers was never promised that he would be assigned in perpetuity to the position of forklift driver.  (Def.'s Br. in Supp. at 28; citing Pl.'s Dep. at 105.)  Further, even if he were promised the job of forklift driver, says ArvinMeritor, "he was in fact hired as a forklift driver and worked in that capacity for four weeks," and Wagers knew that

35

"employees could be removed from their jobs for performance reasons."  (Def.'s Br. in Supp. at 28; citing Pl.'s Dep. at 73, 97, and 107.)

Wagers responds that the promise made to him was more than merely that he could drive a forklift: "When Arvin[Meritor] promised Wagers that he would be driving a forklift after transferring to the Gladstone plan[t] . . . Arvin[Meritor] was really telling Wagers that it would continue to accommodate him there as it had in Franklin."  (Pl.'s Resp. at 33-34.)  Wagers maintains that Arvin[Meritor] did not make good on that promise.  ArvinMeritor challenges Wagers's logic, however, arguing that no such promise was made for continued accommodations for Wagers's disability because, at the time Wagers was hired, Nunemaker was unaware of any of Wagers's restrictions, disabilities or accommodations. (Def.'s Reply at 17; citing Nunemaker Dep. at 12, 30-31, 36-39.)

We agree with ArvinMeritor based on the available evidence that, if a promise was made at all by ArvinMeritor, it was simply that Wagers would be given the opportunity to drive a forklift when he transferred to the Gladstone plant.  ArvinMeritor kept this promise when it employed Wagers to drive the forklift at the Gladstone plant for the first four weeks after his transfer.  No promise was made that ArvinMeritor would continue forever to accommodate Wagers's disability because neither Nunemaker nor anyone else working at the Gladstone plant was aware of Wagers's disability at the time he was hired.  Further, any implied promise to continue to accommodate him should find its remedy under the ADA claims.  Accordingly, we conclude that ArvinMeritor is entitled to

summary judgment on Wagers's claim of promissory estoppel.

Wagers appears to have abandoned his constructive fraud claim as he makes no mention of it in his response brief.  In <u>Rice v. Strunk</u>, 670 N.E.2d 1280, 1284 (Ind. 1996), the Indiana Supreme Court stated that the elements of constructive fraud are:

> (i) a duty owing by the party to be charged to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party to be charged at the expense of the complaining party. Pugh's IGA, Inc. v. Super Food Services, Inc., 531 N.E.2d 1194 (Ind.Ct.App.1988), trans. denied.

As ArvinMeritor points out in its Brief in Support of Summary Judgment, even if Wagers could show that ArvinMeritor had a duty to him, he cannot demonstrate that ArvinMeritor made "deceptive material misrepresentations of past or existing facts." Because Wagers has failed to demonstrate crucial elements of his constructive fraud and promissory estoppel claims, summary judgment shall be <u>GRANTED</u> in favor of ArvinMeritor on Count Five of Wagers's Complaint.

## Conclusion

For the reasons stated above, ArvinMeritor's motion for summary judgment is hereby <u>DENIED</u> as to Counts One and Two, but <u>GRANTED</u> as to Counts Three, Four, and Five.  IT IS SO ORDERED.

Date:   01/18/2007

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Michael Schultz
5501 East 71st Street, Suite 2
Indianapolis, IN 46220
mlslaw@sbcglobal.net

William N. Ivers
STEWART & IRWIN, P.C.
251 East Ohio Street, Suite 1100
Indianapolis, IN 46204
wivers@silegal.com

Michael A. Moffatt
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
111 Monument Circle, Suite 4600
Indianapolis, IN 46204
mike.moffatt@odnss.com

Brandon M. Shelton
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
111 Monument Circle, Suite 4600
Indianapolis, IN 46204
Brandon.Shelton@odnss.com